281 N.J. Super. 285 (1995)
657 A.2d 462
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BENNY HOGAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 1995.
Decided May 9, 1995.
*287 Before Judges SHEBELL, SKILLMAN and KLEINER.
Susan L. Reisner, Public Defender, attorney for appellant (Sara K. Walsh, Designated Counsel, of counsel and on the brief).
Carmen Messano, Hudson County Prosecutor, attorney for respondent (Timothy Moriarty, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by KLEINER, J.A.D.
Early in the afternoon on August 30, 1989, Elnora Daye informed the Jersey City police that she was the victim of an armed robbery in her home at approximately 11:30 p.m. on August 29, 1989. She provided the police with a signed statement which included the following facts.
Hearing noise and the breaking of glass while in a second floor bedroom of her home, she went into her daughter's room and took her daughter to the second floor landing. A stairway light *288 controlled by a switch on the first floor was turned on, and she observed two men on the first floor at the foot of the stairway. One man climbed the stair and under direction of the second man, pulled a gun and held it to the side of her head. The second man, still on the first floor and later identified as defendant Benny Hogan, ordered Daye to "give up what you got." After that statement was repeated, Daye indicated that her possessions were in her bedroom. Defendant climbed the stairs, entered her bedroom, and then both men left her home. She discovered that $290 and credit cards were removed from her pocketbook.
Her statement also included the following rendition of an event which occurred earlier that day before she reported the robbery to the police:
ANSWER: I was coming out of 8 Erie Street. I got out of my car in front of my house. I noticed one of the guys who robbed me. I went to a man I knew who just got out of prison and the man knew him. So we went up to him and asked him questions about the incident.
The guy who knew him asked him about the incident. He then started talking. He said why are you looking at me like that.
I said because I remember those marks on your face. You were the one who came to my house.
He then said, no, I did not.
I said I remember the car you were in. It was in my backyard. I pulled out a piece of paper with the license plate on it. He then said I ain't going to deny that this is the car. I loaned it to my cousin. If I knew my cousin was going to stick up you people, I would not have let him use the car.
Additionally, the statement indicated that she was shown a photograph of defendant and asked:
QUESTION: Is this the man that was in your house and robbed you?
ANSWER: Yes.
Based solely on that statement, the matter was presented to the grand jury. The only State's witness was Detective Charles Sutaris, who read the entire transcribed statement of his questions *289 and Daye's answers, signed by Daye. Based upon that presentation, defendant was indicted for burglary and robbery.[1]
On May 10, 1990, Daye visited the Public Defender's Office. She provided a public defender with a statement which was tape recorded and included, in part, the following colloquy:
MR. MASK: Explain why you came to this office today.
MS. DAYE: Because I was under a lot of pressure and a lot of things that were said aren't true.
MR. MASK: When you say you were under pressure can you explain how and why you named the person Benny Hogan as the suspect at that time?
MS. DAYE: Yes, I can. Because everybody was telling me about Benny, saying the type of person he was, what he was capable of doing so it made me scared.
MR. MASK: When you say that you heard from people does that mean to say, does that mean that at the time your home was burglarized and that you were robbed you did not see Benny Hogan in your house at that time?
MS. DAYE: No, I didn't.
MR. MASK: You saw I believe you said an automobile, is that correct?
MS. DAYE: Yes.
MR. MASK: Where was the automobile?
MS. DAYE: On Union Street.
MR. MASK: And it was only after you had conversations with other people did they tell you that it must have been Benny Hogan that you told the police that's who it was?
MS. DAYE: Yes, I did.
MR. MASK: And when you went to the police station were you given the opportunity to selected [sic] among a group of photographs?
MS. DAYE: No.
MR. MASK: What did they do when they asked you to look at a photograph?
MS. DAYE: They gave me a book and they had the page with Benny's picture on it with another picture and they said is this Benny Hogan and I said, yes, it is.
MR. MASK: And when they said is this Benny Hogan what were they doing?
MS. DAYE: They pointed to Benny Hogan.
MR. MASK: They pointed at his photograph?
MS. DAYE: Yes.
MR. MASK: And you basically, you just agreed?
MS. DAYE: Yes.

*290 MR. MASK: Because in your mind you thought that it was Benny Hogan because people had said that it must have been Benny because they have seen his car?
MS. DAYE: Yes, they did.
MR. MASK: But based on what you recall is it your honest testimony and statement that based on what you saw and the photograph that was not Benny at that time?
MS. DAYE: No, it wasn't.
MR. MASK: Has anyone forced you or coerced you in making a statement such as this?
MS. DAYE: No, they didn't.
MR. MASK: Whose idea was it to come and give this statement at this time?
MS. DAYE: My own.
Daye also indicated to the public defender that she had informed the prosecutor that she did not wish to proceed with the charges. The prosecutor requested that she appear to sign a statement withdrawing the charges, but she did not as she could not locate the prosecutor's office.
That same date, Daye signed the following affidavit.
AFFIDAVIT
I, Elnora Daye residing at 18 Oak St. City of Jersey City, NJ, in the County of Hudson State of New Jersey, being 18 years or more of age, having been duly sworn, do hereby state that I elect, voluntarily, without any coercion from any person or fear of reprisal against me, without any intimidation or persuasion by any person, without any inducements, bribes or other gifts having been offered to me, and after a full consideration of all factors to be no longer interested in, concerned with or in any capacity involved in or with the prosecutor of the defendant, Benny Hogan, for the crime of Burglary & Robbery. I have no objection whatsoever now, and I will not now or ever after raise or permit anyone to raise on my behalf an objection to the present dismissal of the above-mentioned criminal charges presently pending against this defendant by the appropriate Judicial Authority. Reason: I realize now that Mr. Hogan is not the person who committed the crimes against me.[2]
Although the record on appeal is not particularly clear, it appears that defendant's trial was scheduled to commence in July 1990. Daye apparently met with the prosecutor and advised her *291 of the recantation given to the public defender. Daye apparently attributed her recantation to a fear of retribution based on threats and conversations with defendant's family.
Daye's testimony at trial explains the basis of her alleged fears. According to Daye, after defendant was arrested on August 31, 1989, Daye was contacted by defendant's sister and other family members, who urged her to withdraw the charges against defendant. Daye was offered money for the care of her child. Daye also claimed that she had received three notes left in or under her door at her home, purportedly written by defendant's mother, requesting that she contact defendant's mother. Daye contacted defendant's mother, who requested that Daye withdraw the criminal charges. Daye claimed that she was frightened, and she therefore agreed to withdraw the charges. On May 10, 1990, Daye was accompanied by defendant's mother and sister when she visited the public defender, gave a taped statement recanting her prior accusation, and signed the affidavit.
After Daye met with the prosecutor and explained that her recantation was a result of her fear of retribution, the prosecutor sought a postponement of the trial and indicated that she intended to present the matter anew to the grand jury. The court granted the postponement.
On July 9, 1990, the public defender forwarded Daye's taped statement and affidavit to the prosecutor and requested that both be presented as exculpatory evidence to the grand jury on August 15, 1990. The prosecutor concluded that the taped statement and affidavit were not exculpatory, as both statements had been coerced by threats from defendant's mother and sister.
On August 15, 1990, the matter was again presented to the grand jury. The only State's witness was Detective Charles Sutaris. The transcript of that presentation reflects that Sutaris did not read Daye's August 30, 1989 statement to the grand jury. Rather, Sutaris only provided the grand jury with a synopsis. The prosecutor made no reference to the prior January 12, 1990 *292 indictment, nor to the recantation statement provided to the public defender. The grand jury returned a five count indictment.
Defendant filed a motion to dismiss the superseding indictment on the basis of alleged prosecutorial error in failing to present exculpatory evidence to the grand jury. That motion was denied.
Tried to a jury, defendant was convicted of robbery while armed, contrary to N.J.S.A. 2C:15-1 (count one); robbery, contrary to N.J.S.A. 2C:15-1 (count two); burglary while displaying a deadly weapon, contrary to N.J.S.A. 2C:18-2 (count three); burglary, contrary to N.J.S.A. 2C:18-2 (count four); unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5b (count six); and possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (count seven). Defendant was acquitted on count five charging aggravated assault, contrary to N.J.S.A. 2C:12-1b(4).
After defendant's post-trial motions for a judgment n.o.v. or, alternatively, a new trial were denied, defendant was sentenced on count one to a custodial term of fifty years with a sixteen and two-third year period of parole ineligibility and a concurrent term of fifteen years with a five-year period of parole ineligibility on count three. Counts two, four, six and seven were dismissed.
On appeal, defendant raises nine points of error:
POINT I
THE TRIAL COURT COMITTED [SIC] REVERSIBLE ERROR IN DENYING THE DEFENDANT'S PRE-TRIAL MOTION TO DISMISS THE INDICTMENT.
POINT II
THE TRIAL COURT COMITTED [SIC] REVERSIBLE ERROR IN DENYING THE DEFENDANT'S MOTION FOR MISTRIAL AFTER THE PROSECUTOR'S OPENING STATEMENT.
POINT III
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FIRST, RESERVING ON, AND THEN DENYING, THE DEFENDANT'S MOTION WITH RESPECT TO THE UNAUTHENTICATED PIECE OF PAPER WHICH THE PROSECUTOR SOUGHT TO PRESENT TO THE JURY.

*293 POINT IV

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PERMITTING THE PROSECUTOR TO NEUTRALIZE HIS OWN WITNESS (NOT RAISED BELOW).
POINT V
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PERMITTING THE PROSECUTOR TO (1) ALLUDE TO THE DEFENDANT'S PRIOR CRIMINAL RECORD (2) ELICIT HEARSAY AND (3) LEAD THE WITNESS.
POINT VI
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO ATTEMPT MORE DILIGENTLY TO ELIMINATE THE PREJUDICE BY ADEQUATELY CHARGING THE JURY.
POINT VII
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING THE DEFENDANT'S MOTIONS FOR A JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, A NEW TRIAL.
POINT VIII
ASSUMING, ARGUENDO, THAT THE INDIVIDUAL ERRORS DO NOT CONSTITUTE REVERSIBLE ERROR, THE ERRORS AGGREGATELY DENIED THE DEFENDANT A FAIR HEARING.
POINT IX
THE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.
Preliminarily, we note that in an appeal from an order denying a pretrial motion to dismiss an indictment, we must limit our analysis to the pleadings filed as of the date of the motion and the arguments of counsel presented to the motion judge. Cf. State v. Turcotte, 239 N.J. Super. 285, 299, 571 A.2d 305 (App.Div. 1990) (noting appellate court's limited review, "based on evidence presented at that time," of R. 3:5-7 motion to suppress); State v. Jordan, 115 N.J. Super. 73, 76, 278 A.2d 223 (App.Div.), certif. denied, 59 N.J. 293, 281 A.2d 806 (1971). We may not consider either the evidence produced at the subsequent trial or the ultimate jury verdict. State v. Murphy, 110 N.J. 20, 28, 538 A.2d 1235 (1988).
We recognize that "an indictment should be disturbed only on the `clearest and plainest ground.'" State v. Perry, 124 N.J. 128, 168, 590 A.2d 624 (1991) (citing State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 18-19, 472 A.2d 1050 (1984)). One *294 reason to disturb an indictment, now recognized under our Constitution, N.J. Const. art. I, par. 8, arises from our recognition of a prosecutor's "obligation to exercise his or her discretion in good faith." State v. Smith, 269 N.J. Super. 86, 93, 634 A.2d 576 (App.Div. 1993) (citation omitted), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994). That obligation encompasses the "obligation to give the grand jury evidence in the prosecutor's possession which clearly exculpates a defendant, that is, evidence that directly negates a defendant's guilt." Ibid.
State v. Gaughran, 260 N.J. Super. 283, 615 A.2d 1293 (Law Div. 1992), is an excellent example of a prosecutor's failure to abide by that obligation. In Gaughran, defendant was accused of committing various sexual acts forcibly and against the will of a seventeen year old victim, including anal penetration with his penis and finger and vaginal penetration with his finger. Id. at 285, 615 A.2d 1293. After the crime was reported, the victim received a gynecological exam at a nearby hospital. The Emergency Room notes read:
No external marks on mouth, neck, breasts. Pelvic exam: NEG  no bruises, no lacerations, minimal erythema ext. genitalia, minimal mucoid discharge, CX small, not tender, uterus  small. Adnexae (-) Rectal  tight sphincter  no bruise.
[Ibid.]
When the matter was thereafter presented to the grand jury, there was no mention of that directly exculpatory medical report. On defendant's motion to dismiss the indictment, the trial judge, after thorough review of judicial precedent and treatises, concluded that the prosecutor had violated his obligation to act fairly and impartially. The court dismissed the indictment. Id. at 291, 615 A.2d 1293. Gaughran was cited with approval in Smith, supra, 269 N.J. Super. at 93-94, 634 A.2d 576.
In contrast, in Smith, we affirmed a trial court decision denying a motion to dismiss an indictment on the failure of the prosecutor to present allegedly exculpatory evidence to the grand jury. In Smith, a gas station was robbed at 10:00 p.m. Defendant provided the prosecutor with three witness statements. Id. at 90-91, 634 A.2d 576. One statement accounted for defendant's whereabouts *295 between 7:30 p.m. and 9:00 p.m.; a second statement accounted for defendant's whereabouts between 6:00 p.m. and 7:30 p.m.; and the third statement placed defendant in a location other than the site of the armed robbery, but did not specify the time of the sighting. Id. at 91, 634 A.2d 576. In our decision affirming the trial court, we concluded "the three statements ... simply did not negate guilt. At best they put him at a different location ... some one and one-half hours before the robbery. That evidence would not have led the grand jury to believe an innocent person was being accused." Id. at 97-98, 634 A.2d 576.
In Smith, in establishing a standard for prosecutorial conduct, we rejected the standard recognized in California that "the prosecutor should disclose to the grand jury any evidence which will reasonably tend to negate guilt," as discussed in Johnson v. Superior Court, 15 Cal.3d 248, 124 Cal. Rptr. 32, 34, 539 P.2d 792, 794 (1975). We also rejected the ABA Standards for Criminal Justice § 3-3.6 (1986), which provides in part, "(b) No prosecutor should knowingly fail to disclose to the grand jury evidence which will tend substantially to negate guilt." Smith, supra, 269 N.J. Super. at 95, 634 A.2d 576 (citing ibid.).
In reaching our conclusion in Smith, we stated:
We are inclined to agree with the concerns expressed over the somewhat amorphous ABA/Johnson standard of "reasonably tending to exculpate." Rather we think a standard of "clearly exculpatory" or which "directly negates guilt" would fairly serve to ensure the grand jury's proper functioning as a shield as well as a sword, and would, at the same time recognize the substantial discretion accorded a prosecutor. We agree that a more lenient standard could transform the grand jury "from an accusatory to an adjudicatory body." U.S. v. Williams, 504 U.S. [36] at 51, 112 S.Ct. [1735] at 1744, 118 L.Ed.2d [352] at 368. But we think the grand jury cannot function as a shield if the prosecutor does not present evidence that clearly negates the guilt of a defendant. See State v. Gaughran, 260 N.J. Super. at 290, 615 A.2d 1293 (objective medical evidence that alleged rape by defendant did not occur). Cf. State v. Perry, 124 N.J. at 168, 590 A.2d 624.
[Id. at 97.]
We also quoted LaFave & Israel, 2 Criminal Procedure § 15.4(d) (1991).
"The prosecutor's disclosure obligation is limited to evidence which, if believed, would establish in itself that [the defendant] had not committed the crime  such as *296 a confession by another to the crime or evidence that `the accused was nowhere near the scene of the crime when it occurred.' Even then, consideration will be given to the likely reliability of the non-disclosed evidence."
[Smith, supra, 269 N.J. Super. at 97, 634 A.2d 576 (quoting ibid.).]
We consider a victim's recantation of an original accusation to be the type of "evidence, which if believed, would establish in itself that [the defendant] had not committed the crime." Ibid.
Here, in response to defendant's motion to dismiss the indictment, the assistant prosecutor assigned to this case argued:
And in my statement of facts, procedural history to the Court, I have indicated that the victim of this incident had come to the Prosecutor's office and spoke to investigator Pentay (phon.) about a week or so after the statement was given and indicated at that time that she was harassed, threatened and/or coerced into giving that statement. She had testified at a parole revocation hearing, the State of New Jersey Parole Board to a Hearing Officer that she was either forced, coerced, threatened and harassed into giving that statement and she gave a statement to an investigator on July 9th, that she was forced, harassed, coerced into giving that statement then. They call it exculpaty [sic] evidence.
Thereafter, the assistant prosecutor concluded her argument:
After I review all the evidence and I determine that [Daye's recantation is] not true, then I have absolutely no obligation to present to the Grand Jury. If it was exculpatory and I believed it and I believe that this defendant did not commit that crime, then I would be the first one to say that I should not present the matter without submitting that to the Grand Jury. But that's really with all due respect to the Court, that's my call. That's the Prosecutor's discretion.
The prosecutor contends that her duty to disclose only arises if the statement is exculpatory and if the prosecutor believes it to be truthful. This cannot possibly be the determinative basis for the decision whether to disclose evidence to the grand jury. The standard for prosecutorial conduct may not rest on a prosecutor's belief. The decision whether to indict is solely entrusted to the grand jury, which must decide "whether a prima facie case has been made out." Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). This is particularly so where the victim's accusation is the only evidence of the crime. The State had no evidence of this robbery other than Daye's version of the event. There were no witnesses, and there was no physical evidence of the crime gathered by the police.
*297 LaFave & Israel indicate that a narrow standard as to a prosecutor's duty to present exculpatory evidence serves to avoid "`convert[ing] a grand jury proceeding from an investigative one to a mini-trial on the merits.'" Smith, supra, 269 N.J. Super. at 96, 634 A.2d 576 (quoting LaFave & Israel, supra, at 318).
The concept of a mini-trial must encompass the circumstance where accusatory evidence is presented by one witness and contradictory exculpatory evidence is presented by another witness. For example, in Smith, the State presented accusatory evidence to the grand jury. Had the prosecutor also presented the statements of defendant's three witnesses, the grand jury would be called upon to weigh the testimony, and the proceedings would become a "mini-trial." On the other hand, presentation of the sole witness victim to the grand jury, where testimony is presented under oath and presumably with utmost solemnity, would permit the grand jury to consider the witness' initial accusation, her recantation, and the reasons for recantation. Such a presentation would not create a mini-trial. It would allow the grand jury to evaluate the evidence to determine if the State has a prima facie case requiring a trial of the accused.
We also note that here, Daye signed a statement accusing defendant in August 1989, when she reported the crime. She signed a recantation affidavit and gave a taped statement to the public defender in May 1990. She did not sign any document or give a taped statement disavowing her recantation at the initial meeting with the prosecutor, as proffered in the prosecutor's oral argument on the motion to dismiss the indictment. The statement that she allegedly signed in July on meeting with the prosecutor's investigator was not presented to the court.
The prosecutor certainly has the unbridled discretion to determine which cases will be presented to the grand jury. However, once a decision is made to present a case to the grand jury, it is incumbent on the prosecutor to present clearly exculpatory evidence to the grand jury.
*298 In Smith, supra, 269 N.J. Super. at 95-96, 634 A.2d 576, we cited decisions in several jurisdictions (Hawaii, Massachusetts, New York and New Mexico) which rejected the California/ABA Standard as too broad. Two recent decisions in New York are helpful in resolving the issue posed in this appeal.
In People v. Ramjit, 203 A.D.2d 488, 612 N.Y.S.2d 600, 602, appeal denied, 84 N.Y.2d 831, 617 N.Y.S.2d 151, 641 N.E.2d 172 (1994), an indictment dismissed by the trial court was reinstated on appeal. The appellate court concluded that a prosecutor's failure to present certain defense alibi witnesses to the grand jury was not grounds for dismissing an indictment, as the allegedly exculpatory evidence "neither implicated a complete legal defense nor was of such quality as to create the potential to eliminate a `needless or unfounded prosecution.'" Ibid. That conclusion comports with our decision in Smith.
In People v. Darrisaw, 206 A.D.2d 661, 614 N.Y.S.2d 622 (1994), a defendant was indicted for criminal possession of a controlled dangerous substance. Id. 614 N.Y.S.2d at 623. Defendant's companion at the time of arrest signed an affidavit which stated that the drugs were his and not defendant's. Id. 614 N.Y.S.2d at 624. The companion retracted the statement after obtaining counsel. Ibid. The court noted the prosecutor's obligation to "present all evidence that could, if believed, avoid a needless or unfounded prosecution." Ibid. (citing People v. Valles, 62 N.Y.2d 36, 476 N.Y.S.2d 50, 464 N.E.2d 418 (1984)). However, the court noted that the grand jury proceeding is "not intended to be a `mini-trial', at which competing evidence is weighed and questions of fact resolved; rather, its purpose is simply to determine whether the evidence proffered by the People, if fully credited, would support a conviction." Ibid. The court found that the companion's affidavit merely presented questions of fact and credibility. Ibid. Thus, the affidavit need not have been presented to the grand jury.
Here, defendant was compelled to stand trial based upon an accusatory statement given to police officers which was recanted *299 under oath but which was thereafter allegedly disavowed. The only witness presented to the grand jury was the police officer who, on the superseding indictment, did not even read the original accusation to the grand jury, but instead presented a synopsis. The grand jury was not presented with the recantation, nor was it presented with the disavowal of the recantation. It was deprived of its right to investigate and its ultimate task of determining whether the State did in fact present a prima facie case. That scenario was solely a result of the assistant prosecutor's personal belief that the recantation was not credible. We find that such conduct is another example of the prosecutor using the grand jury as its "playtoy." State v. Engel, 249 N.J. Super. 336, 359, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991); Gaughran, supra, 260 N.J. Super. at 290, 615 A.2d 1293. We conclude that the court should have dismissed this indictment on defendant's motion without prejudice.
In view of our conclusion, we need not discuss defendant's points of error referable to his trial or his sentence.
The judgment of conviction is reversed.
NOTES
[1] A copy of the indictment of January 12, 1990 has not been made a part of the record on appeal. We are unable to determine which specific statutory sections were cited in the indictment.
[2] The underlined portions of the affidavit are handwritten and the balance is typed.